United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DELINA FERRETTI, | ) Case No.: 11-CV-04486 |
| Plaintiff, | ) |
| v. | ) ORDER DENYING MOTION FOR |
| | ) SUMMARY JUDGMENT |
| PFIZER INC., | ) |
| Defendant. | ) |
| | ) |
| | ) |

Before the Court is Defendant Pfizer Inc.'s ("Defendant") Motion for Summary Judgment. ECF No. 63 ("Motion"). The Court previously determined that this matter was appropriate for resolution without a hearing pursuant to Civil Local Rule 7–1(b) and accordingly vacated the hearing on the parties' Motion set for January 10, 2013. Having considered the parties' submissions and the relevant case law, the Court DENIES the Motion.

I.      FACTUAL BACKGROUND

        A.      Plaintiff is Hired by Defendant

        Plaintiff Delina Ferretti ("Plaintiff") was employed as a Clinical Protocol Manager ("CPM") for Defendant between April 2008 and September 2010 in Defendant's oncology group. *See* Declaration of Delina Ferretti in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Ferretti Decl.") ¶¶ 3, 4. Plaintiff was recruited and hired by Bridget Rohmiller, a Senior Clinical Protocol Manager, who became Plaintiff's supervisor. *Id.* ¶ 3. The

United States District Court
For the Northern District of California

1 | oncology group was based in New London, Connecticut; La Jolla, California; and Milan, Italy. *Id.*
2 | However, Plaintiff primarily worked from her home in Campbell, California. *Id.*[1]

### B.     Plaintiff is Assigned to the PanHER Project

After Plaintiff was hired in April 2008, Plaintiff began working primarily on the PanHER project. *Id.* ¶ 6. This project was directed toward the clinical testing of PF-0299804, a molecule with promise as a cancer inhibitor drug. *Id.* The PanHER project was comprised of thirty-six (36) studies for Phases I-III. *Id.* Other individuals on the team included Carole Klingerman who served as the project manager. *Id.* Robert Millham and Joseph O'Connell, M.D. were the clinicians. *Id.* Louis Denis, M.D., who was the Global Clinical Lead, and Stephen Letrent who was the Asset Team Leader in charge of development of the drug. *Id.*

In or about May 2008, shortly after Plaintiff was hired, Ms. Rohmiller promoted Plaintiff to Lead CPM. *Id.* ¶ 5. In this capacity, Plaintiff was assigned to supervise Erika Jones who was an Associate Director CPM. *Id.* Ms. Jones was assigned to four of the Phase I studies associated with the PanHER project, including the A7471001 study ("A7471001 Study"). *Id.* ¶ 7.

### C.     Plaintiff Reports Issues with the PanHER Study Data

In or about September or October 2008, Plaintiff was informed that there were problems with the data associated with the A7471001 Study. *Id.* ¶ 8. Plaintiff contacted Ms. Jones about these issues and was assured by Ms. Jones that the study data was "clean"[2] and that everything was fine. *Id.* Notwithstanding Ms. Jones' assurances regarding the study data, Plaintiff still had concerns. *Id.* Accordingly, Plaintiff contacted Ms. Rohmiller. *Id.* Ms. Rohmiller agreed that a team should be formed to review the A7471001 Study data. *Id.*

Plaintiff and Ms. Rohmiller assembled a team, consisting of Plaintiff and several other

---

[1] The Court notes that, in connection with Defendant's Reply, Defendant filed three documents purporting to contain objections to Plaintiff's declaration, Plaintiff's deposition testimony, and Plaintiff's expert declarations submitted in support of Plaintiff's Opposition. *See* ECF Nos. 69-1, 69-2, and 69-3. Local Rule 7-3(a) provides that all evidentiary objections "to [a] motion must be contained within the brief or memorandum." Accordingly, the Court disregards Defendant's evidentiary objections that are not contained within Defendant's Reply.

[2] Data is referred to as "dirty" if it has not been cleaned. Motion at 3 n. 3. Data has been cleaned when it has been reviewed by "cross functional groups such as study managers, data managers, statisticians, programmers, etc…" to identify any abnormalities and queries that have been run to confirm that the data "is consistent with what actually happened." *Id.* (citing Rohmiller Dep. at 26:20-27:8, 27:23-28:21).

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

1   individuals, to review the study data.  *See id.* ¶ 9.  This team ultimately concluded that the study

2   data was "dirty."  *Id.*  On November 7, 2008, Plaintiff discussed this finding with members of the

3   PanHER team including Dr. Denis, Dr. O'Connell, Mr. Millham, and Ms. Klingerman.  *Id.*  At this

4   meeting, Plaintiff stated that there were serious issues with the data and that the study was not

5   conducted in accordance with the "U.S. Food and Drug Administration's… QT/QTc guidelines…."

6   *Id.*

7        In November, 2008, Ms. Jones went on medical leave, and David Milliard assumed Ms.

8   Jones' responsibilities.  *Id.* ¶ 10.  Mr. Milliard began training the PanHER team to complete a

9   Clinical Study Report ("CSR") in connection with the A7471001 Study.  *Id.*  A CSR is a report that

10  must be completed and submitted to the FDA after the completion of the first phase of a trial.  *Id.*

11  Plaintiff contends that, notwithstanding the fact that no CSR had been completed on the first phase

12  of the A7471001 Study, the second phase and the third phases of the study were permitted to go

13  forward.  *Id.*  Plaintiff contends that this "violat[ed]… applicable regulations and policies…."  *Id*.

14       Plaintiff continued to express concerns regarding the PanHER project to Ms. Rohmiller in

15  early 2009.  Specifically, in March 2009, Plaintiff emailed Ms. Rohmiller to inform Ms. Rohmiller

16  that Dr. Denis had indicated to Plaintiff that the clinicians on the PanHER project, Mr. Millham

17  and Dr. O'Connell, were unwilling to review the A7471001 Study data before moving forward

18  with additional studies. *Id*. ¶  16.  Also, in early 2009, during a teleconference, Plaintiff informed

19  Ms. Rohmiller, along with Mr. Letrent and Ms. Klingerman, that the PanHER studies were not

20  being conducted in compliance with applicable regulations, the "principles of GCP," or

21  Defendant's policies and procedures.  *Id.* ¶ 17.  Plaintiff also informed the group that Plaintiff was

22  not being permitted to take standard measures to correct these deficiencies.  *Id.*

23       **D.        Plaintiff Requests a Transfer from the PanHER Project**

24       In approximately June 2009, Plaintiff approached Ms. Rohmiller and asked to be

25  transferred off the PanHER project.  *Id.* ¶ 19.  In making this request, Plaintiff told Ms. Rohmiller

26  that Plaintiff felt that she was "not able to perform [her] responsibilities," specifically her "ethical

27  and job responsibilities [while] working on [the PanHER] team."  Delina Ferretti Deposition

28  Transcript ("Ferretti Dep."), attached to Lowenthal Report as Exhibit A, at 51:3-5.  Plaintiff also

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

1    stated that "[e]very day [on the PanHER project] is… nonproductive." *Id.* at 51:6.  Ms. Rohmiller

2    agreed to transfer Plaintiff to another project.  *Id.* at 51:8-10.

3          When Plaintiff requested that Ms. Rohmiller transfer Plaintiff to another project, Ms.

4    Rohmiller was herself in the process of transitioning out of the oncology group.  Ferretti Decl. ¶ 19.

5    Thus, in approximately April or May of 2009, Ms. Rohmiller began to transfer her responsibilities

6    in the oncology group to Rashmi Gandhi, who, along with Tito Fernandez, had been assigned to

7    assume Ms. Rohmiller's role on an interim basis until a permanent replacement could be found.

8    *See* Rashmi Gandhi Deposition Transcript ("Gandhi Dep."), attached to Lowenthal Report as

9    Exhibit B, at 29:23-30:14.

10         Notably, around the same approximate time Plaintiff made her request to be transferred,

11   Mr. Letrent, the Asset Team Leader with responsibility for the PanHER project, had a meeting with

12   Ms. Rohmiller's supervisor, Li Xu, to discuss Plaintiff's performance.  *See* Li Xu Deposition

13   Transcript ("Xu Dep."), attached to Lowenthal Report as Exhibit G, at 14:22-23 (stating that Ms.

14   Xu joined Defendant in April 2009); *id.* at 25:2-17 (discussing meeting with Mr. Letrent and

15   stating that the meeting took place approximately two months after Ms. Xu joined Defendant).

16   During this meeting, Mr. Letrent informed Ms. Xu that he was "concerned for the [PanHER] team"

17   because of ongoing conflicts between Plaintiff and other members of the team, particularly Ms.

18   Jones.  *Id.* at 27:9-15, 29:8-15, 33:25-34:6.  Mr. Letrent requested that Ms. Xu "take action" to

19   remedy the situation.  *Id.* at 35:13-22.  Ms. Xu made a recommendation to Ms. Gandhi and Mr.

20   Fernandez that they transfer both Plaintiff and Ms. Jones off the PanHER team.  *Id.* at 39:11-22.

21   However, the evidence reflects that Ms. Xu left the ultimate decision as to how to proceed up to

22   Ms. Gandhi and Mr. Fernandez.  *See id.* at 39:14-17 (stating that it was Ms. Gandhi and Mr.

23   Fernandez's "organization… [and] [t]hey need[ed] to make th[e] decision").

24         **E.      Plaintiff Is Transferred and Begins Reporting to Rashmi Gandhi**

25         Plaintiff was ultimately transferred to the CDK and HSP90 trials, reporting to Ms. Gandhi.

26   Ferretti Decl. ¶ 20.  Plaintiff states in her declaration submitted in support of the instant Motion

27   that, in June or July of 2009, Plaintiff had "a transition meeting" with Ms. Gandhi and Ms.

28   Rohmiller.  *Id.*  Plaintiff states in her declaration that, during this meeting, Plaintiff "recounted the

4

serious problem with the PanHER studies and explained that [she] had asked to be transferred from the PanHER program because [Plaintiff] refused to participate in activity that [she] believed to be illegal and unethical." Ferretti Decl. ¶ 20; *see also* Ferretti Dep. at 59:14-23 (stating that Plaintiff "believe[d] that there was a meeting… between me and Bridget and Rashmi where we discussed exactly why I wanted to be off of PanHER" and that "[i]t was a transition meeting").[3]

## F.    Plaintiff Is Subject to Adverse Employment Actions

Plaintiff has adduced evidence that, after Plaintiff was transferred, she was subject to a number of actions that detrimentally impacted Plaintiff's performance and created an unfavorable work environment for Plaintiff. First, Plaintiff states in her declaration that the CDK team to which she was transferred was "in disarray, with infighting, squabbling, and hostile interactions between the team members." Ferretti Decl. ¶ 21; *see also* Ferretti Dep. at 62:6-8 (stating that when Plaintiff joined the CDK team she discovered team members were "disruptive and argumentative" and that the team was "disintegrated"). Plaintiff also states that, following Plaintiff's transfer, Ms. Gandhi assigned Plaintiff "an abnormally high workload." Ferretti Decl. ¶ 23 ("Ms. Gandhi assigned me a total of fourteen (14) Phase I-II studies, while a typical employee in such a position would be assigned only three (3) to four (4) studies to manage."); *see also* Gandhi Dep. at 214:1-6 (stating that Plaintiff was assigned "1.14 FTEs" of work instead of the usual 1.0). Plaintiff states that Ms. Gandhi failed to respond to Plaintiff's requests that Ms. Gandhi reduce Plaintiff's workload. Ferretti Decl. ¶ 23. Plaintiff further states that, in October 2009, Ms. Gandhi "stripped [Plaintiff] of [her] responsibilities as a Lead CPM." *Id*. ¶ 24. Plaintiff also states that in November 2009, Ms. Gandhi refused to replace two underperforming study managers on Plaintiff's teams, despite having removed three study managers from Ms. Jones' team after Ms. Jones complained. *Id.* ¶ 22.

In addition to the aforementioned issues, Plaintiff states that Ms. Gandhi refused to authorize travel for Plaintiff so that Plaintiff, who was located in Campbell, CA, could meet with Plaintiff's teams, which were located in La Jolla, California, in person. *Id.* ¶ 25. Plaintiff

---

[3] During Plaintiff's deposition, Plaintiff also stated that she did not "discuss wanting to be moved off the PanHER team with anybody" besides Ms. Rohmiller. *See* Ferretti Dep. at 51:20-23. Defendant contends that this statement contradicts Plaintiff's statement in her declaration that she informed Ms. Gandhi of the reasons for Plaintiff's request for a transfer during their transition meeting in June or July of 2009. *See* Motion at 6. This issue will be discussed below.

5

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

additionally states that Ms. Gandhi denied Plaintiff's request for a replacement computer, despite the fact that Plaintiff's request had previously been authorized by Ms. Rohmiller (*id.* ¶ 26), and that Ms. Gandhi refused to reimburse Plaintiff for job related expenses, specifically expenses relating to teleconferences Plaintiff hosted in August 2009, while Plaintiff was travelling abroad to visit Plaintiff's father (*id.* ¶ 27).

Furthermore, in December 2009, Ms. Gandhi gave Plaintiff a performance review that was negative and less favorable than Plaintiff's 2008 performance review and included a number of criticisms of Plaintiff's performance. *See* Ferretti Decl., Ex. B (2008 performance review noting Plaintiff's "solid working relationships" and ability to provide "guidance and direction to ensure study milestones," and giving Plaintiff a final rating of 2.9); *id.*, Ex. E (2009 performance review noting that Plaintiff has a troubled relationship with members of her team and is viewed by team members as not "leading/directing the team to success," and providing a final rating of 2.0). Plaintiff contends that Ms. Gandhi's review was "subjective, unsupported, and contained false and misleading information." *Id.* ¶ 28.

Defendant contends that Plaintiff's negative review was due in large part to ongoing complaints regarding Plaintiff's performance received from the CDK team. For example, the project manager for the CDK project complained that: (1) Plaintiff was nonresponsive; (2) Plaintiff had not followed up on certain actions; (3) there was never clarity with respect to timelines or deliverables; (4) there were issues between Plaintiff and the rest of the team; (5) Plaintiff did not run meetings properly; (6) the team had little confidence in Plaintiff; and (7) Plaintiff frequently seemed confused and posed questions unrelated to the topic and often provided too much off target. *See* Gandhi Dep. at 57:20-25.

### G.    Plaintiff Contacts Human Resources and Compliance Departments

In late 2009, Plaintiff contacted Virginia Haaland, an employee in Defendant's human resources organization. Ferretti Decl. ¶ 29. Plaintiff informed Ms. Haaland that Plaintiff believed she was being retaliated against because Plaintiff had raised concerns about the PanHER project. *Id.* Plaintiff stated that Defendant's acts or retaliation included *inter alia* Ms. Gandhi's: (1) giving Plaintiff an unfair 2009 performance review; (2) assigning Plaintiff an abnormally high workload;

(3) denying Plaintiff's request for a replacement computer; and (4) denying Plaintiff authorization to meet in-person with Plaintiff's teams.  *Id.*

Ms. Haaland apparently failed to take action in response to Plaintiff's claims.  *Id.* ¶ 30. Accordingly, on March 29, 2010, while Plaintiff was visiting her father in the United Kingdom, Plaintiff contacted Defendant's Compliance Hotline.  *Id.*  Plaintiff claims that during her call, Plaintiff "reported [her] concerns about study safety, unreported adverse events, and lack of a final or interim CSR for the Phase I A7471001 study before proceeding to the Phase II and III studies…." *Id.*[4]

### H.    Plaintiff Begins Reporting to Jill Stuart-Smith

During early March 2010, Jill Stuart-Smith was appointed to fill the management role that Ms. Gandhi and Mr. Fernandez had been filling on an interim basis.  *See* Jill Stuart-Smith Deposition Transcript ("Stuart-Smith Dep."), attached to Lowenthal Report as Exhibit F, at 22:12-18; 24:19-21.  Accordingly, when Plaintiff returned from her trip to the United Kingdom, Plaintiff began reporting to Ms. Stuart-Smith.  Ferretti Decl. ¶ 32.

### I.    Plaintiff is Placed on a Performance Improvement Plan and a Final Plan

Shortly after Ms. Stuart-Smith began as Plaintiff's supervisor, Ms. Stuart-Smith had a conversation with Ms. Xu regarding Plaintiff.  During this conversation, Ms. Xu informed Ms. Stuart-Smith that Plaintiff had had some performance issues (Stuart-Smith Dep. at 26:20-23), and that these issues had been outlined by Ms. Gandhi in Plaintiff's 2009 performance review (*id.* at 28:2-4, 43:21-24).  Ms. Xu further informed Ms. Stuart-Smith that Ms. Xu wanted Ms. Stuart-Smith to attempt to coach Plaintiff and to help Plaintiff improve her performance.  *Id.* at 27:25-28:2.

After speaking with Ms. Xu, Ms. Stuart-Smith also met with Ms. Gandhi to review Plaintiff's 2009 performance review.  Stuart-Smith Dep. at 31:21-23.  During this meeting, Ms. Gandhi discussed with Ms. Stuart-Smith the issues with Plaintiff's performance, specifically

---

[4] Notably, the Compliance Hotline employee with whom Plaintiff spoke apparently did not record any statements by Plaintiff indicating that there were issues with the PanHER project.  *See* Ferretti Dep. at 96:7-8, 103:11-12, 103:16-18 (describing content of compliance call report).  Plaintiff states that the Compliance Hotline employee must have "missed [the] first" five minutes of his conversation with Plaintiff.  *Id.* at 104:5-9.

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

Plaintiff's difficulties working with fellow CDK team members.  *Id.* at 36:15-22.  Ms. Gandhi also indicated to Ms. Stuart-Smith that Plaintiff had had some issues while Plaintiff was a member of the PanHER team.  *Id.* at 45:15-19.  During Ms. Stuart-Smith's deposition, Ms. Stuart-Smith was unable to remember any specifics regarding what Ms. Gandhi told Ms. Stuart-Smith about Plaintiff's issues while working on the PanHER project.  *Id.* at 45:20-23.

After Ms. Stuart-Smith's meeting with Ms. Gandhi, Ms. Stuart-Smith and Ms. Xu spoke again to discuss the best approach for addressing Plaintiff's performance issues.  *Id.* at 57:1-4.  One option that was raised was placing Plaintiff on a performance improvement plan.  *Id.* at 57:4-5.  The possibility of placing Plaintiff on a performance improvement plan had previously been considered while Ms. Gandhi was Plaintiff's supervisor, but Ms. Gandhi did not proceed with the PIP because she was Plaintiff's interim supervisor and the human resources department required that the PIP be implemented by someone who was Plaintiff's permanent manager.  *See* Gandhi Dep. at 111:19-112:11.  Because neither Ms. Xu nor Ms. Stuart-Smith had much experience implementing a performance improvement plan, Ms. Stuart-Smith spoke with Elaine Shaw, an employee in Defendant's employee relations group, to gather more information regarding the procedures for creating and implementing a PIP.  *See* Stuart-Smith Dep. at 57:5-10.

Subsequently, on April 15, 2010, Ms. Stuart-Smith and Ms. Gandhi met with Plaintiff to inform Plaintiff she was being placed on a PIP.  Stuart-Smith Dep. at 92:10-13.  On April 28, 2010, Ms. Stuart-Smith sent Plaintiff a letter outlining Plaintiff's performance improvement plan ("PIP").  *See* Ferretti Decl., Ex. F.  Shortly after Plaintiff received the written PIP, Plaintiff prepared a response contesting the allegations in the PIP.  *See id.* ¶ 32 and Ex. F.[5]  Plaintiff also states that, around the approximate time Plaintiff was being placed on the PIP, Plaintiff informed Ms. Stuart-

---

[5] The Court notes that in the Opposition, Plaintiff states that Ms. Stuart-Smith prepared the PIP without "investigat[ing] Plaintiff's involvement with the PanHER team… [or] meet[ing] with Plaintiff to understand the issues."  Opposition at 17.  Plaintiff cites an approximately 50 page excerpt of Ms. Stuart-Smith's deposition testimony.  *See id.* (citing 68:13-114:7).  It is not the Court's responsibility to sift through large portions of the record to discover relevant facts and the Court will not do so in this instance.  In future filings, Plaintiff should identify with precision the relevant portions of the record and ensure that the referenced excerpts support the proposition for which they are being cited.  *See Forsberg v. Pac. N.W. Bell Tel. Co.,* 840 F.2d 1409, 1417–18 (9th Cir. 1988) ("The district court is not required to comb the record to find some reason to deny a motion for summary judgment.").

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

1   Smith that Plaintiff had requested a transfer from the PanHER project because Plaintiff did not

2   wish to participate in any illegal conduct.  *See id.* ¶ 33 ("On several occasions, during

3   teleconferences in April and May 2010, I informed Ms. Stuart-Smith that I had asked to be

4   removed from the PanHER program due to my refusal to participate in illegal and unethical

5   conduct.").

6        In addition to responding to the PIP, on May 3, 2010, Plaintiff emailed Ms. Shaw a

7   response to Plaintiff's 2009 performance review.  *See* Elaine Shaw Deposition Transcript ("Shaw

8   Dep."), attached to Lowenthal Report as Exhibit E, at 141:14-21.[6]  Prior to receiving the May 3

9   response, Ms. Shaw had previously been assigned to investigate Plaintiff's call to the compliance

10  department.  *See* Shaw Dep. at 137:1-8.  In Plaintiff's response to her 2009 performance review,

11  Plaintiff indicated that she had concerns about the study data associated with the PanHER project,

12  and further stated that she had requested that she be transferred because of these concerns.[7]  *See id.*

13  at 139:20-23; Ferretti Decl. Ex. E.  Ms. Shaw contacted Defendant's compliance group and

14  requested that they investigate Plaintiff's claims of improper conduct in connection with the

15  PanHER study data.  *See* Shaw Dep. at 139:23-25.  Ms. Shaw continued to investigate Plaintiff's

16  concerns about Ms. Gandhi's treatment of Plaintiff.  *Id.* at 145:2-9.

17        On July 7, 2010, Plaintiff was provided with a final performance improvement plan ("Final

18  PIP") (collectively with the PIP, the "PIPs").  Ferretti Decl. ¶ 34 and Ex. G.  Shortly after

19  _____

20  [6] Plaintiff indicates that she prepared this response "shortly" after she received her performance
    review in December 2009, and that employee responses to performance reviews are generally
21  available on Defendant's computer system.  Ferretti Decl. ¶ 28.  However, Plaintiff does not state
    that she sent the response to Ms. Gandhi, Ms. Stuart-Smith, or Ms. Xu.  Indeed, Plaintiff does not
22  state to whom, if anyone, she provided the response, or if or when Plaintiff uploaded the response
    to Defendant's computer system.  Furthermore, Ms. Stuart-Smith, Ms. Gandhi, and Ms. Xu all
23  testified that, even if Plaintiff did upload her response to the system, none of them saw the response
    or received notice that it had been uploaded.  *See* Stuart-Smith Dep. at 96:4-22, 104:1-9; Xu Dep.
24  at 73:18-74:10; Gandhi Dep. at 82:14-83:10.  Thus, the only evidence to which the Court has been
    directed showing that any of Defendant's employees saw the response is Ms. Shaw's statement that
25  she received and reviewed the response on May 3, 2012.  *See* Shaw Dep. at 141:14-21.
    [7] Prior to receiving the performance review response, Ms. Shaw had at least one discussion with
26  Plaintiff in which Plaintiff "made… references" to issues with the PanHER study data.  Shaw Dep.
    at 200:2-7.  This discussion apparently took place on April 9, 2010.  *See id.* at 206:19-24.
27  However, Ms. Shaw stated that, at the time, she was focused on Plaintiff's statements regarding
    ongoing "colleague conflict issues" and did not "have a sense that there was anything to refer to
28  [Defendant's] [L]egal Compliance department until [she] received" Plaintiff's 2009 performance
    review response.  *Id.* at 200:7-14.

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

reviewing the Final Plan, Plaintiff provided a response to the statements contained therein.  *Id.*, Ex. G.

On July 10, 2010, Plaintiff was contacted by Ms. Xu who informed Plaintiff that someone from Defendant's compliance department would be contacting Plaintiff.  Ferretti Decl. ¶ 36.  On July 14, 2010, Plaintiff spoke with Michael Pomeranz, an attorney for Defendant, and another employee.  *Id.*  Plaintiff reiterated her concerns regarding the PanHER studies.  *Id.*

Ms. Stuart-Smith testified that, despite her coaching, Plaintiff continued to have performance issues.  *See* Stuart-Smith at 115:18-116:24.  Accordingly, Ms. Stuart-Smith testified that the decision was made to terminate Plaintiff.  *See id.*; *see also id.* at 122:16-24.  On August 19, 2010, Plaintiff received notice that she was going to be terminated.  Ferretti Decl. ¶ 37.  Plaintiff was terminated approximately one month later on September 16, 2010.  *Id.*

## II.      PROCEDURAL BACKGROUND

Plaintiff filed her Complaint in this matter on September 9, 2011.  *See* ECF No. 1.  Defendant filed the instant motion for summary judgment ("Motion") on November 29, 2012.  ECF No. 63.  Plaintiff filed her Opposition to the Motion ("Opposition") on December 13, 2012.  ECF No. 67.  Defendant filed its Reply in support of the Motion ("Reply") on December 20, 2012.  ECF No. 69.

## III.     STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *See id.*  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."  *Id.* at 254.  The question is "whether a jury could reasonably find either that the [moving party] proved his case by the quality and quantity of evidence required by the governing law or that he did not."  *Id.* (emphasis omitted).  "[A]ll justifiable inferences are to be drawn in [the nonmovant's] favor."  *See*

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

1     *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc)

2     (citing *Anderson*, 477 U.S. at 255).

3         The moving party bears the initial responsibility for informing the district court of the basis

4     for its motion and identifying those portions of the pleadings, depositions, interrogatory answers,

5     admissions and affidavits, if any, that it contends demonstrate the absence of a genuine issue of

6     material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly

7     supported motion for summary judgment "may not rest upon the mere allegations or denials of

8     [that party's] pleading, but . . . must set forth specific facts showing that there is a genuine issue for

9     trial." *Anderson*, 477 U.S. at 250; *see also* Fed. R. Civ. P. 56(e). The opposing party need not

10    show the issue will be resolved conclusively in its favor. *See Anderson*, 477 U.S. at 248–49. All

11    that is necessary is submission of sufficient evidence to create a material factual dispute, thereby

12    requiring a jury or judge to resolve the parties' differing versions at trial. *See id.*

13        The moving party bears the initial burden of identifying those portions of the pleadings,

14    discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*

15    *Corp.*, 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial,

16    it must affirmatively demonstrate that no reasonable trier of fact could find other than for the

17    moving party, but on an issue for which the opposing party will have the burden of proof at trial,

18    the party moving for summary judgment need only point out "that there is an absence of evidence

19    to support the nonmoving party's case." *Id.* at 325; *accord Soremekun v. Thrifty Payless, Inc.*, 509

20    F.3d 978, 984 (9th Cir. 2007). Once the moving party meets its initial burden, the nonmoving

21    party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that

22    there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

23    **IV.     DISCUSSION**

24        **A.     Wrongful Termination in Violation of Public Policy Based on California Labor**
                **Code Section 1102.5**

25        Defendant argues that summary judgment should be granted in Defendant's favor on

26    Plaintiff's claim for wrongful termination in violation of a public policy. Motion at 14.

27        Wrongful termination in violation of public policy is a California common law cause of

28

**United States District Court**
For the Northern District of California

11

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    action providing that "when an employer's discharge of an employee violates fundamental

2    principles of public policy, the discharged employee may maintain a tort action and recover

3    damages traditionally available in such actions." *Tameny v. Atl. Richfield Co.*, 27 Cal. 3d 167, 170

4    (1980); *see also Freund v. Nycomed Amersham*, 347 F.3d 752, 758 (9th Cir. 2003). The public

5    policy implicated must be "(1) delineated in either constitutional or statutory provisions; (2)

6    'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the

7    interests of the individual; (3) well established at the time of discharge; and (4) substantial and

8    fundamental." *Freund*, 347 F.3d at 758 (quoting *City of Moorpark v. Super. Ct.*, 18 Cal. 4th 1143,

9    1159 (1998)).

10    Where a plaintiff "relies upon a statutory prohibition to support a common law cause of

11    action for wrongful termination in violation of public policy, the common law claim is subject to

12    statutory limitations affecting the nature and scope of the statutory prohibition." *Stevenson v.*

13    *Super. Ct.*, 16 Cal. 4th 880, 904 (1997). Plaintiff's wrongful termination claim is based on Labor

14    Code Section 1102.5 and therefore must follow the contours of claims under this section.

15    Section 1102.5 is a "whistle-blower" protection statute. Subsection (c), the subsection

16    relevant to this case, states: "An employer may not retaliate against an employee for refusing to

17    participate in an activity that would result in a violation of state or federal statute, or a violation or

18    noncompliance with a state or federal rule or regulation." Cal. Lab. Code § 1102.5(c).

19    Courts analyzing claims under Section 1102.5 apply the burden shifting analysis first set

20    forth by the United States Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

21    First, "the plaintiff [must] establish a prima facie case of retaliation." *Patten v. Grant Joint Union*

22    *High Sch. Dist.*, 134 Cal. App. 4th 1378, 1384 (2005). To establish a prima facie case "a plaintiff

23    must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse

24    employment action, and (3) there is a causal link between the two." *Id.*. "The requisite degree of

25    proof necessary to establish a *prima facie* case… on summary judgment is minimal and does not

26    even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26

27    F.3d 885, 889 (9th Cir. 1994).

28    If the plaintiff establishes a prima facie case of retaliation, the defendant must "provide a

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

legitimate, [non-]retaliatory explanation for its acts." *Patten*, 134 Cal. App. 4th at 1384. If the defendant provides a legitimate [non-]retaliatory explanation for its acts, "the plaintiff [must] show this explanation is merely a pretext for the retaliation." *Id.*

Defendant argues that Plaintiff's wrongful termination claim fails because: (1) Plaintiff did not engage in a protected activity (*See* Motion at 15); (2) Plaintiff cannot establish a causal connection between Plaintiff's engaging in any protected activity and Plaintiff's termination (*see id.* at 16); and (3) Defendant had a legitimate, non-retaliatory explanation for terminating Plaintiff, and there is no evidence that this explanation was mere pretext (*see id.* at 17). The Court addresses each of these arguments in turn.

### 1.    Protected Activity

Defendant initially argues that Plaintiff has failed to adduce evidence sufficient to show that Plaintiff engaged in protected activity. *Id.* at 15. Under Section 1102.5(c), protected activity includes "refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." Cal. Lab. Code § 1102.5(c). Courts construing California Government Code Section 12940(h), which like Section 1102.5, prohibits an employer from retaliating against an employee who engages in "protected activity," specifically activity protected under the California Fair Employment and Housing Act (FEHA), have held that an employee invoking the protection of the statute must have given the employer notice that the employee was engaging in a protected activity. *See Yanowitz v. L'Oreal USA, Inc*, 36 Cal. 4th 1028, 1035 (2005)[8]. Defendant contends that this notice requirement applies to Section 1102.5 as well. *See* Motion at 15. Plaintiff does not dispute this proposition. Accordingly, the Court concludes that, in order for an employee's refusal to participate in illegal conduct to qualify as protected activity under Section 1102.5(c), the employer must be on notice that the employee's reason for refusing to participate in the conduct is that the conduct violates a

---

[8] The case law concerning California Labor Code Section 1102.5, particularly subsection (c), is somewhat limited. However, there is a substantial amount of case law concerning similar retaliation provisions in FEHA and Title VII. To the extent the requirements and legal standards governing claims under FEHA and Title VII are similar to those under Section 1102.5, specifically with respect to the *McDonnell Douglas* burden shifting analysis, the Court will rely on cases under FEHA and Title VII in addressing Plaintiff's claims under Section 1102.5.

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    state or federal statute, rule, or regulation.

2         Defendant argues that "Plaintiff did not engage in a protected activity because even

3    assuming [Plaintiff] requested to be transferred off of the PanHER clinical trial, she did not put

4    Pfizer on notice that [Plaintiff] was refusing to participate in illegal conduct." *Id.* at 15.

5    Specifically, Defendant argues that, while Plaintiff requested that Plaintiff's supervisor, Ms.

6    Rohmiller, transfer Plaintiff from the PanHER team, Plaintiff indicated that she was requesting the

7    transfer "because [Plaintiff's] days were unproductive." *Id.* Defendant contends that Plaintiff's

8    statements failed to make clear that [Plaintiff] was requesting the transfer because she did not want

9    to participate in illegal activity. *See id.* Defendant argues that "[g]iven that [Ms.] Rohmiller knew

10   Plaintiff experienced interpersonal issues with several of the employees working on the PanHER

11   clinical trial, [Ms.] Rohmiller was not on notice that Plaintiff's request stemmed from any refusal

12   to engage in illegal activity." *Id.*

13        The Court is not persuaded.  As an initial matter, Plaintiff has produced evidence that, when

14   Plaintiff made her transfer request in approximately June 2009 (Ferretti Decl. ¶ 19), Ms. Rohmiller

15   was aware that Plaintiff had concerns regarding the PanHER study data and whether the PanHER

16   project was being conducted in accordance with applicable laws and regulations.  Plaintiff first

17   raised issues regarding the data supporting the PanHER studies with Ms. Rohmiller in September

18   or October of 2008.  Specifically, Plaintiff expressed concern that the data might not be 'clean.'

19   *See* Ferretti Decl. ¶ 8; Ferretti Dep. at 24:14-25:30; Rohmiller Dep. at 21:2-9.  Then, in March

20   2009, Plaintiff emailed Ms. Rohmiller to inform her that Plaintiff had learned from Dr. Denis, the

21   Global Clinical Lead, that the two clinicians with responsibility for the PanHER program, Ms.

22   Millham and Dr. O'Connell, were refusing to review the dirty study data before moving forward

23   with the new studies.  *See id.* ¶ 16, Ex. C (email to from Plaintiff to Ms. Rohmiller).  Subsequently,

24   in early 2009, during a teleconference with Mr. Letrent, Ms. Lingerman, and Ms. Rohmiller,

25   Plaintiff informed the group that the PanHER studies were not being conducted in compliance with

26   applicable regulations, the principles of GCP, or Pfizer's policies and procedures.  Ferretti Decl. ¶

27   17.

28        Furthermore, Plaintiff has presented evidence that she informed Ms. Rohmiller that these

14

concerns were motivating Plaintiff's request for a transfer.  As Defendant acknowledges in the

factual background section of the Motion, Plaintiff has adduced evidence that when Plaintiff

requested to be transferred out of the PanHER team, Plaintiff stated not only that Plaintiff felt her

days were "unproductive," but also that Plaintiff felt that she was "not able to perform [her]

responsibilities," specifically her "ethical and job responsibilities…."  Delina Ferretti Deposition

Transcript ("Ferretti Dep."), attached to Lowenthal Report as Exhibit A, at 51:3-6; *see also* Motion

at 4 (quoting Ferretti Dep. at 51:1-7).  Given Ms. Rohmiller's awareness of Plaintiff's concerns

regarding the PanHER project, Plaintiff's statement about her ethical concerns was sufficient to put

Ms. Rohmiller on notice that Plaintiff was requesting a transfer because Plaintiff did not wish to

participate in any illegal conduct in connection with the PanHER project.

          For the reasons set forth above, Plaintiff has adduced evidence sufficient to show that

Plaintiff engaged in protected activity for the purposes of establishing a prima facie case on

summary judgment.  *See Wallis*, 26 F.3d at 889 ("The requisite degree of proof necessary to

establish a *prima facie* case… on summary judgment is minimal and does not even need to rise to

the level of a preponderance of the evidence").

                              **2.      Causal Link**

          Defendant contends that summary judgment should be granted in Defendant's favor

because Plaintiff has failed to present evidence establishing a causal connection between her

protected activity (requesting to be transferred from the PanHER team) and her termination.  *See*

Motion at 16.  The Court is not persuaded.

          A "causal link may be established by an inference derived from circumstantial evidence,

such as the employer's knowledge that the [employee] engaged in protected activities and the

proximity in time between the protected action and allegedly retaliatory [adverse] employment

decision."  *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 69 (2000) (citing *Fisher v. San

Pedro Peninsula Hospital*, 214 Cal.App.3d 590, 614-15 (1989)).  An adverse employment decision

is one that "materially affect[s] the terms and conditions of employment."  *Patten v. Grant Joint

Union High Sch. Dist.*, 134 Cal. App. 4th 1378, 1387 (2005) (quoting *Yanowitz,* 36 Cal.4th at

1051).  With respect to the Defendant's knowledge, for the purposes of causation, it is sufficient

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

that at least one of the persons responsible for making each adverse employment decision had knowledge that Plaintiff had engaged in protected activity.  *See Abboub v. Int'l Bus. Machines Corp.*, C 04-00017 JW, 2006 WL 905319, at *7 (N.D. Cal. Apr. 7, 2006) ("Being that 'the employer' is often a 'large economic enterprise[ ] with [a] layered and compartmentalized management structure[ ],' the employee 'can establish the element of causation by showing that *any* of the persons involved in bringing about the adverse action held the requisite animus, provided that such person's animus operated as a 'but-for' cause, i.e., a force without which the adverse action would not have happened.'" (quoting *Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 95, 108 (2004))).  Thus, Plaintiff may establish causation by showing that: (1) one of the decision makers responsible for each of the adverse employment actions taken against Plaintiff had knowledge that Plaintiff had engaged in protected activity, and (2) there is close proximity in time between the protected activity and the adverse employment action.  *See Abboub*, 2006 WL 905319 at *7; *Morgan*, 88 Cal. App. 4th at 69.

a)        **Adverse Employment Events**

Before proceeding to determine whether Plaintiff has adduced evidence of knowledge and proximity, the Court must first determine what adverse employment actions were taken against Plaintiff.  As set forth above, an adverse employment decision is one that "materially affect[s] the terms and conditions of employment."  *Patten*, 134 Cal. App. 4th at 1387 (quoting *Yanowitz,* 36 Cal. 4th at 1054).   This includes not only terminations, but also the "entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career."  *Id*.  Moreover, where a plaintiff alleges that her employer engaged in a series of retaliatory acts, these acts may be considered collectively in determining whether they materially affected the plaintiff's performance.  *See, e.g.* *Yanowitz*, 36 Cal. 4th at 1055 (holding that a court may consider alleged retaliatory acts "collectively… [when] an employer's retaliatory acts constitute… a series of subtle, yet damaging, injuries" rather than "one swift blow"); *Patten*, 134 Cal. App. 4th at 1390 (same).  While "[m]inor or relatively trivial adverse actions by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee do not" constitute

16

adverse employment actions, the definition of adverse employment actions "must be interpreted liberally and with a reasonable appreciation of the realities of the workplace." *Yanowitz*, 36 Cal. 4th at 1054.

Here, Plaintiff has adduced evidence of a string of actions, beginning shortly after Plaintiff was transferred from the PanHER project. Specifically, Plaintiff has produced evidence that:

(1) In June or July 2009, Plaintiff was transferred to the CDK team, which "was in disarray, with infighting, squabbling, and hostile interactions between the team members" (Ferretti Decl. ¶¶ 20-21; Ferretti Dep. at 62:6-8 (stating that when Plaintiff joined the CDK team she discovered team members were "disruptive and argumentative" and that the team was "disintegrated"));

(2) Plaintiff was assigned an abnormally high workload by Ms. Gandhi (Ferretti Decl. ¶ 23 (stating that Plaintiff was assigned fourteen… studies, while a typical employee in [Plaintiff's]… position would be assigned only three… to four… studies to manage"); Gandhi Dep. at 72:6-7 (stating "I know that Delina's workload was high" and that Ms. Gandhi and Mr. Fernandez were "working to get that down"); *id.* at 214:1-6 (stating that Plaintiff was assigned "1.14 FTEs" of work instead of the usual 1.0));

(7) In August 2009, Ms. Gandhi refused to reimburse Plaintiff for job related expenses, specifically expenses associated with hosting teleconferences while Plaintiff was traveling abroad to visit her father (Ferretti Decl. ¶ 27);

(5) In October 2009, Ms. Gandhi "stripped [Plaintiff] of [her] responsibilities as a Lead CPM" (Ferretti Decl. ¶ 24; Ferretti Dep. at 53:13-24);

(6) In November 2009, Ms. Gandhi refused to replace two underperforming study managers on the CDK team at Plaintiff's request (*id.* ¶ 22);

(3) Ms. Gandhi and Ms. Xu denied Plaintiff's requests to travel to La Jolla to meet with Plaintiff's teams in person (Ferretti Decl. ¶ 25; Ferretti Dep. at 71:21-22; Gandhi Dep. at 76:25-77:3);

(4) Ms. Gandhi denied Plaintiff's request for a replacement computer (*see* Ferretti Decl. ¶ 26; Ferretti Dep. at 71:2-20);

(8) In December 2009, Ms. Gandhi gave Plaintiff a negative performance review (Ferretti Decl. ¶ 28);

(9) In April 2010, Ms. Stuart-Smith and Ms. Xu placed Plaintiff on a Performance Improvement Plan ("PIP"), and in July 2010, Ms. Stuart-Smith and Ms. Xu placed Plaintiff on a Final Plan (*see* Ferretti Decl. ¶¶ 32-34)

(10) In August 2010, Ms. Stuart-Smith and Ms. Xu terminated Plaintiff (*id.* ¶ 37; *See* Stuart-Smith Dep. at 122:16-24)

(collectively, "Adverse Employment Events").

Plaintiff's termination is undoubtedly an adverse employment action. Furthermore,

17

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

1   transferring Plaintiff to a dysfunctional team and assigning Plaintiff an abnormally high

2   workload may also have been adverse employment actions to the extent that they materially

3   affected Plaintiff's "job performance" (*Patten*, 134 Cal. App. 4th at 1389), and may have

4   paved the way for Plaintiff's ultimate termination.  The remaining actions (*e.g.* denying

5   Plaintiff's request for a replacement computer), when considered "collectively" with the

6   transfer and abnormal workload, may also have materially affected the conditions of

7   Plaintiff's employment.  *Id.* at 1390.

8           In a footnote, Defendant argues that neither "Plaintiff's 2009 performance rating,

9   the PIP, nor the 30 Day Final Plan are adverse actions under Labor Code section 1102.5

10  because they did not 'materially affect' the terms and conditions of Plaintiff's employment

11  with Pfizer."  Motion at 16 n.7.  The Court is not persuaded.

12          With respect to Plaintiff's 2009 performance rating, the Ninth Circuit has

13  recognized that "undeserved performance ratings, if proven, [may] constitute 'adverse

14  employment decisions'."  *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).  Here,

15  Plaintiff has stated that the statements contained in her 2009 performance review were

16  "unsupported."  Ferretti Decl. ¶ 28.  Furthermore, Plaintiff has attached to her declaration

17  her response to her 2009 performance review, in which Plaintiff outlines the basis for her

18  belief that her performance review was undeserved.  *Id.*, Ex. E.[9]  In this response, Plaintiff

19  states, in essence, that Plaintiff performed her duties on the CDK team, including meeting

20  "or exceed[ing] all goals and [bringing] in on time or early every timeline and milestone,"

21  and that Plaintiff's performance was hindered by substandard performance from other

22  members of the CDK team.  *Id.* at 2.  This is sufficient to show, for the purposes of

23  establishing Plaintiff's prima facie case, that Plaintiff's performance review was

24  undeserved.

25          Similarly, Plaintiff has stated that the PIPs were "unfounded."  Ferretti Decl. ¶ 35.

26  Plaintiff has attached to her declaration her responses to these PIPs.  *See id.* Exs. F and G.

27

28  ---
    [9] On summary judgment, the Court liberally construes Plaintiff's declaration in opposition to summary judgment as incorporating the statements in the attached responses.

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

In these responses, Plaintiff explains why the criticisms of Plaintiff in the PIPs were unwarranted and provides support for her positions. *See id.* Exs. F and G. Accordingly, the Court concludes that Plaintiff has presented evidence sufficient to raise a material factual dispute as to whether the PIPs were undeserved.

Furthermore, it is clear that the 2009 performance review and the PIPs materially affected Plaintiff's employment. The 2009 performance review led Ms. Xu to suggest that Plaintiff be placed on the PIP. *See* Stuart-Smith Dep. at 27:25-28:4; 57:1-5. Similarly, the PIPs led to Plaintiff's termination. Thus, Plaintiff has presented sufficient evidence to show, at this stage, that the 2009 performance review and PIPs were adverse employment actions.

For the reasons set forth above, the Court finds that, for the purposes of Plaintiff's prima facie case on summary judgment, the Adverse Employment Events constitute adverse employment actions.[10] *See Wallis*, 26 F.3d at 889 ("The requisite degree of proof necessary to establish a *prima facie* case… on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence").

Having identified the relevant Adverse Employment Events, the Court proceeds to determine whether Plaintiff has presented sufficient evidence to show that Plaintiff's supervisors, Ms. Gandhi, Ms. Stuart-Smith, and Ms. Xu, had knowledge that Plaintiff had engaged in protected activity when the relevant employment actions were taken.

### b) Knowledge of Decision Makers

#### (1) Ms. Gandhi

With respect to Ms. Gandhi, Plaintiff argues that Ms. Gandhi became aware that Plaintiff had engaged in the Protected Activity in approximately June or July of 2009. *See* Opposition at 3 (arguing that Ms. Gandhi was "aware of [Plaintiff's] reasons for" requesting to be transferred).

---

[10] The Court emphasizes that the Court concludes that the aforementioned actions are adverse employment actions solely for the purposes of determining whether Plaintiff has presented a prima facie case on summary judgment. There may indeed be legitimate justifications for some or all of these alleged Adverse Employment Events. For example, Ms. Gandhi's decision to deny Plaintiff travel appears to be based on a change to the travel policy. *See* Gandhi Dep. at 75:24-76:5, 79:12-14, 80:2-8, 81:1-14 (discussing changes to travel policy). Defendant bears the burden of adducing evidence showing legitimate explanations for each action.

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

1    In Plaintiff's declaration, Plaintiff states that, "[d]uring a transition meeting," in or about

2    June or July of 2009, Plaintiff "recounted the serious problem with the PanHER studies and

3    explained that [Plaintiff] had asked to be transferred from the PanHER program because [she]

4    refused to participate in activity that I believed to be illegal and unethical." Ferretti Decl. ¶ 20.

5    Additionally, during Plaintiff's deposition, Plaintiff stated that, while she was unable to remember

6    the exact date, Plaintiff "believe[d] that there was a meeting… between me and Bridget

7    [Rohmiller] and Rashmi [Gandhi] where we discussed exactly why I wanted to be off of PanHER"

8    and that "[i]t was a transition meeting." Ferretti Dep. at 59:14-23. Thus, Plaintiff has adduced

9    evidence that Ms. Gandhi was aware that Plaintiff had engaged in protected activity in June or July

10   of 2009, when the first of the Adverse Employment Events occurred.[11]

11   Defendant argues that Plaintiff's statement in her declaration is not sufficient to create a

12   triable issue of material fact because Plaintiff made an inconsistent statement during Plaintiff's

13   deposition. Reply at 6. Specifically, Defendant cites Plaintiff's statement during her deposition

14   that Plaintiff did not discuss "wanting to be moved off the PanHER team with anybody else at

15   Pfizer" besides Ms. Rohmiller. Ferretti Dep. at 51:20-23. Defendant contends that Plaintiff's

16   attempt to rely on her declaration to establish a triable issue of fact as to whether Plaintiff informed

17   Ms. Gandhi of Plaintiff's reasons for requesting a transfer violates the "'sham' affidavit rule,"

18   which prohibits "a party [from] creat[ing] an issue of fact by an affidavit contradicting [her] prior

19   testimony." Motion at 6 (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir.

20   1991).

21   The Court is not persuaded. As set forth above, during Plaintiff's deposition, Plaintiff also

22   explicitly stated that she informed Ms. Gandhi of the reasons for her transfer request. *See* Ferretti

23

24   [11] Plaintiff also cites Ms. Gandhi and Ms. Rohmiller's deposition testimony in support of her
     contention that Plaintiff shared the reasons for her request for a transfer with Ms. Gandhi in June or

25   July of 2009. *See* Opposition at 3. Plaintiff's citation to Ms. Rohmiller and Ms. Gandhi's
     deposition testimony is unavailing. In the cited portion of Ms. Rohmiller's deposition testimony,

26   Ms. Rohmiller stated that she did not "remember" having a conversation with Ms. Gandhi about
     Plaintiff's request for a transfer or the reasons for Plaintiff's request. *See* Rohmiller Dep. at 21:15-

27   21. The cited portions of Ms. Gandhi's deposition testimony are similarly unhelpful. *See, e.g.*,
     Gandhi Dep. at 38:22-39:16 (stating that Ms. Rohmiller and Ms. Gandhi had a conversation about

28   Plaintiff, but the conversation related to the "relationship issues between Delina and Erika Jones"
     and Ms. Rohmiller "didn't go into a lot of detail…").

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

Dep. at 59:14-23.   Moreover, the statement cited by Defendant does not necessarily imply that Plaintiff *never* discussed her request to be transferred with anyone besides Ms. Rohmiller.  Rather, Plaintiff's statement could be construed as a statement that Plaintiff did not discuss her desire to be transferred with anyone else *at the time Plaintiff made the request*.  Thus, it is not clear that the deposition statement Defendant cites contradicts Plaintiff's declaration or Plaintiff's other deposition testimony.  *See* Ferretti Decl. ¶ 20; Ferretti Dep. at 59:14-23.  Moreover, on summary judgment, all justifiable inferences are to be drawn in favor of the non-movant, in this case Plaintiff.  *See United Steelworkers of Am.*, 865 F.2d at 1642.  Accordingly, the Court concludes the sham affidavit rule does not apply.  *See Red Shield Ins. Co. v. Barnhill Marina & Boatyard, Inc.*, C 08-02900 WHA, 2009 WL 1458022, at *3 (N.D. Cal. May 21, 2009) (holding that sham affidavit rule did not apply to "ambiguous" deposition testimony that did "not directly contradict the assertions in the declaration").

    The Court finds that, while Plaintiff's evidence regarding Ms. Gandhi's knowledge is by no means overwhelming, it is sufficient to show, for the purposes of establishing Plaintiff's prima facie case on summary judgment, that Ms. Gandhi had knowledge of Plaintiff's reasons for requesting a transfer in June or July of 2009.  *See Wallis*, 26 F.3d at 889 ("The requisite degree of proof necessary to establish a *prima facie* case… on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence").

### (2)     Ms. Stuart-Smith

    Ms. Stuart-Smith assumed Ms. Gandhi's role as Plaintiff's supervisor in approximately March or April of 2010.  *See* Ghandi Dep. at 65:2-3 (stating that Ms. Gandhi stopped working with Plaintiff "about March of 2010.").  With respect to Ms. Stuart-Smith, Plaintiff states in her declaration that, "[o]n several occasions, during teleconferences in April and May 2010, I informed Ms. Stuart-Smith that I had asked to be removed from the PanHER program due to my refusal to participate in illegal and unethical conduct."  Ferretti Decl. ¶ 33.  Defendant contends that this statement should be disregarded in light of Plaintiff's statement that she did not discuss wanting to be transferred from the PanHER team with anybody else at Pfizer besides Ms. Rohmiller.  *See* Reply at 5.  This argument fails for the reasons set forth above.  Thus, the Court concludes that

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Plaintiff has adduced sufficient evidence to show, for the purposes of establishing a prima facie

2  case on summary judgment, that as of April or May of 2010, Ms. Stuart-Smith knew that Plaintiff

3  had requested a transfer to avoid participating in illegal conduct (the Protected Activity).  *See*

4  *Wallis*, 26 F.3d at 889 ("The requisite degree of proof necessary to establish a *prima facie* case…

5  on summary judgment is minimal and does not even need to rise to the level of a preponderance of

6  the evidence").

7  **(3)    Ms. Xu**

8          Ms. Xu was the Head of Global Oncology Operation, and was Ms. Gandhi and Ms. Stuart-

9  Smith's supervisor during the relevant period.  *See* Xu Dep. at 14:22-15:19.  Plaintiff has not

10  directed the Court to any specific evidence concerning Ms. Xu's knowledge that Plaintiff had

11  requested that she be transferred from the PanHER project due to the issues with the study data.[12]

12  However, during her deposition, Ms. Xu was asked: "[Y]ou had no idea that she was ever

13  concerned about being targeted or retaliated from anything she did on the job, up until the time she

14  was fired; is that your knowledge?  A: That's incorrect."  *Id.* at 73:1-7.  Ms. Xu went on to state

15  that she learned about Plaintiff's complaints and concerns about being retaliated "from the

16  communications… [Ms. Xu was] copied on."  *Id.* at 73:10-12.  Plaintiff also states in her

17  declaration that Ms. Xu contacted Plaintiff "[i]n or around July 2010," after Plaintiff made her

18  complaint to the compliance department, to inform Plaintiff that someone from the compliance

19  department would be contacting Plaintiff.  Ferretti Decl. ¶ 36.  These statements support the

20  inference that Ms. Xu was aware of Plaintiff's concern that Plaintiff was being retaliated against

21  and the facts underlying Plaintiff's concerns (*e.g.* the fact that Plaintiff had requested a transfer out

22  of the PanHER team due to Plaintiff's concerns regarding dirty study data) sometime before

23

24  [12] In the Statement of Facts portion of the Opposition, Plaintiff states that Ms. Xu had
conversations with Mr. Letrent, the Asset Team Leader with responsibility for the PanHER project,
25  and Ms. Rohmiller about the ongoing issues between Plaintiff and Ms. Jones.  *See* Opposition at
10-11.  However, the portions of Ms. Xu's deposition cited by Plaintiff indicate that neither Mr.
26  Letrent nor Ms. Rohmiller informed Ms. Xu about the issues with the PanHER study data or that
Plaintiff had requested that she be transferred off the PanHER team because of those issues.  *See*
27  Xu Dep. at 30:5-13 (stating that Mr. Letrent did not inform Ms. Xu that Plaintiff had complained
about issues with the PanHER study data); *id.* at 36:10-16 ("Q: What did Bridget Rohmiller tell
28  you about the problems in the PanHER study?  A: She didn't particularly talking about the
PanHER study.  She basically gave me her perspective about Delina and Erica Jones.").

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

1    Plaintiff was terminated.  Moreover, on summary judgment, all justifiable inferences are to be

2    drawn in favor of the non-movant, in this case Plaintiff.  *See United Steelworkers of Am.*, 865 F.2d

3    at 1642.

4         For the reasons set forth above, the Court finds that Plaintiff has presented sufficient

5    evidence, at the summary judgment stage, to infer that the decision maker responsible for each

6    Adverse Employment Event had knowledge that Plaintiff had engaged in protected activity when

7    that Adverse Employment Event occurred.

8                        **c)       Proximity**

9         The Court also finds that Plaintiff has presented adequate evidence of proximity to establish

10   her prima facie case on summary judgment.  The proximity requirement is met where a series of

11   adverse employment actions begins shortly after a plaintiff engages in protected activity.  *See*

12   *Abboub*, 2006 WL 905319, at *8 ("The evidence which Plaintiff has presented shows that

13   Defendant's alleged series of retaliatory acts commenced within a very short time after he filed his

14   discrimination complaint. This satisfies the temporal proximity requirement.").  Here, Plaintiff has

15   presented evidence that shortly after Plaintiff requested that Ms. Rohmiller transfer Plaintiff off the

16   PanHER project (*i.e.* shortly after Plaintiff engaged in protected conduct), Plaintiff was transferred

17   to the dysfunctional CDK team and assigned an abnormally high workload.  *See* Ferretti Decl. ¶¶

18   19-23.  As set forth in Section IV(B)(1), additional Adverse Employment Events occurred after

19   Plaintiff was transferred to the CDK team.  These events culminated in Plaintiff's termination in

20   August 2010.  Accordingly, the Court concludes that Plaintiff has presented adequate evidence of

21   proximity for the purposes of establishing Plaintiff's prima facie case.

22        In light of the Court's conclusion that Plaintiff has presented sufficient evidence of

23   knowledge and proximity, the Court holds that Plaintiff has satisfied her burden of showing a

24   causal connection between Plaintiff's protected activity and the Adverse Employment Events for

25   the purposes of establishing Plaintiff's prima facie case on summary judgment.

26            **3.    Pfizer's Non-Retaliatory Reason for Terminating Plaintiff and Whether
                     There Is Adequate Evidence that Pfizer's Reason is Mere Pretext**

27        Pfizer argues that, "[e]ven assuming Plaintiff can establish a *prima facie* case of retaliation,

28

23

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

Pfizer had a legitimate non-retaliatory reason for terminating [Plaintiff's] employment." Motion at

17. Specifically, Pfizer argues that Plaintiff was terminated because "Plaintiff's supervisors

received multiple ongoing, consistent, negative feedback regarding Plaintiff's performance" from

"people who were unaware that Plaintiff requested to be transferred off of the PanHER clinical

trial." *Id.*

Plaintiff does not dispute that Defendant's stated reason for terminating Plaintiff is non-

retaliatory. Rather Plaintiff argues that Plaintiff's claim should not be dismissed because a triable

issue exists as to whether Defendant's stated reason for terminating Plaintiff is mere pretext. *See*

Opposition at 21-22. The Court agrees with Plaintiff that a triable issue of fact exists with respect

to pretext. [13]

As set forth above, where a plaintiff has established a prima facie case of retaliation, the

burden shifts to the defendant to "provide a legitimate, [non-]retaliatory explanation for its acts."

*Patten*, 134 Cal. App. 4th at 1384. If the defendant provides a legitimate [non-]retaliatory

explanation for its acts, "the plaintiff [must] show this explanation is merely a pretext for the

retaliation." *Id.* A plaintiff may establish pretext either by persuading the court that a

discriminatory reason more likely motivated the employer or by showing that the employer's

proffered explanation is unworthy of credence. *Morgan*, 88 Cal. App. 4th at 68. Unlike direct

evidence of pretext, "[c]ircumstantial evidence of pretense must be specific and substantial in order

to create a triable issue with respect to whether the employer intended to discriminate on an

improper basis." *Id.* at 69 (internal citations and quotation marks citations omitted). This

"standard [must however be] 'tempered' by [the fact]… that a plaintiff's burden to raise a triable

issue of pretext is 'hardly an onerous one.'" *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108,

1113 (9th Cir. 2011).

---

[13] The Court notes that Defendant has not offered any non-retaliatory reasons for the other Adverse Employment Events besides Plaintiff's termination. For example, Defendant does not offer a non-retaliatory reason for Plaintiff's being assigned an abnormally high workload. Accordingly, with respect to the issue of pretext, the Court focuses exclusively on whether Plaintiff has adduced sufficient evidence to create a genuine issue of fact with respect to whether Defendant's stated reasons for terminating Plaintiff were pretextual.

24

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

### a)      Mr. Letrent's Statements

Plaintiff argues that there is direct evidence of pretext because, after Plaintiff made her opposition to the PanHER study data known, Mr. Letrent, the Asset Team Leader in charge of the project, told Ms. Xu to remove Plaintiff from the PanHER team because Plaintiff was putting the studies at risk.  Opposition at 21.  The Court is not persuaded.  As recognized by the Court in *Morgan*, "[d]irect evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption."  *Morgan*, 88  Cal. App. 4th at 67.  Here, Mr. Letrent made a request that Ms. Xu "take action" to remedy the ongoing conflict between Plaintiff and other members of the PanHER team including Ms. Jones.  Xu Dep. at 35:13-22.  Moreover, Mr. Letrent never stated that he was requesting that Plaintiff be transferred because Plaintiff had refused to accept the dirty PanHER study data.  Accordingly, Mr. Letrent's request that Ms. Xu help him resolve the situation with Plaintiff does not provide *direct* evidence of a retaliatory motive.[14]

### b)      Disparate Treatment

Plaintiff additionally argues that pretext may be inferred from the fact that "Plaintiff was treated differently from other similarly-situated employees, who were not whistleblowers" and that this difference in treatment provides "circumstantial evidence of retaliation."  Opposition at 22. Specifically, Plaintiff argues that: "[1] Plaintiff was denied travel to meet with [Plaintiff's] team, while others were allowed such travel; [2] Gandhi failed to timely provide Plaintiff with a new, properly functioning computer, while other employees with computer issues were immediately given new laptops; [3] Plaintiff was not allowed to remove ineffective study managers from her team, while another CPM was allowed to remove three study managers with a mere phone call; and [4] Plaintiff's supervisors failed to change the reporting relationship between Plaintiff and her subordinates, as had happened when similar 'relationship issues' arose between another CPM and her reports."  *Id.*  The Court is not persuaded by this evidence.

"A showing that [an employer]… treated similarly situated employees outside [the plaintiff's] protected class more favorably [is]… probative of pretext."  *Vasquez v. County of Los*

---

[14] The Court further notes that Plaintiff has not identified any evidence showing Mr. Letrent had decision making authority or was a but-for cause of any of the Adverse Employment Events.

25

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  *Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (addressing the issue of pretext in connection with

2  plaintiff's Title VII claim). However, "to be deemed 'similarly-situated', the individuals with

3  whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor,

4  have been subject to the same standards[,] and have engaged in the same conduct without such

5  differentiating or mitigating circumstances that would distinguish their conduct or the employer's

6  treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

7          Here, Plaintiff has failed to adduce sufficient evidence showing that she was treated

8  differently than similarly situated employees. For example, Plaintiff claims that Plaintiff was

9  denied travel while other CPMs "traveled first-class to Europe on a monthly basis." Ferretti Decl.

10  ¶ 25. This reference presumably refers to Karen Williams, who was based in Scotland. The only

11  evidence in the record to which the Court has been directed shows that Ms. Williams was also

12  denied travel because of a change in the travel policy in May 2009, before the first of the Adverse

13  Employment Events. *See* Gandhi Dep. at 75:24-76:5; 79:12-14, 80:2-8, 81:1-14. Plaintiff fails to

14  provide any specific facts showing that Ms. Williams was permitted travel after this policy change.

15  As to Plaintiff's remaining disparate treatment claims (e.g. Plaintiff's claim that other employees

16  were immediately given replacement laptops), Plaintiff fails to support these claims with specific

17  facts regarding who the other employees were, or facts showing that the circumstances in those

18  employees' cases were sufficiently similar to the circumstances in Plaintiff's case to draw an

19  inference of dissimilar treatment. In light of Plaintiff's failure to provide sufficient facts to show

20  disparate treatment, the Court finds that this factor does not support an inference of pretext.

21                    c)      **Defendant's Failure to Follow Generally Accepted Human
                              Resources Principles in Connection with Respect to the PIPs**

22          Plaintiff also argues that pretext may be inferred because Defendant's "conduct in placing

23  Plaintiff on performance improvement plans leading to [Plaintiff's] termination did not meet the

24  standards for human resources professionals." Opposition at 22. Plaintiff supports her argument

25  with the expert declaration of Dr. Jay Finkelman. *See id.* at 22-23 (citing Declaration of Jay

26  Finkelman ("Finkelman Decl.") ¶¶ 12-27). Dr. Finkelman, an "industrial and forensic

27  psychologist," purports to be an expert in human resources management. *See* Finkelman Decl. ¶ 1.

28

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

Dr. Finkelman opines that Defendant "failed to follow generally accepted human resources practices and its own policies and procedures in connection with Plaintiff's termination." *Id.* ¶ 13. With respect to the PIP in particular, Dr. Finkelman states that a PIP:

> "should include specific, measurable objectives and timelines for making progress. Moreover, performance standards should be reasonable and attainable. In addition, the employee should be given the full time provided for under the PIP before determining whether additional corrective action and/or termination will be necessary. These standards were apparently not followed, as Plaintiff's supervisors criticized Plaintiff's performance on vague and subjective grounds, failed to follow through with planned meeting and guidance, and failed to acknowledge Plaintiff's efforts to meet the performance standards outlined in the PIPs."

*Id.* ¶ 20 (citing Ferretti Decl. ¶ 32, Ex. G; Ferretti Dep. at 207:5-210:3). Dr. Finkelman also states that, "[u]nder generally accepted human resources management practices," Plaintiff's PIP and Final Plan should have been reviewed by Defendant's human resources department "to ensure that the PIPs were not given in retaliation for Plaintiff's whistleblowing activities." *Id.* ¶ 22. Finally, Dr. Finkelman states that the criticisms of Plaintiff in the PIPs, specifically the statement that Plaintiff needed to improve with respect to "follow through/accountability and communication," were "vague and subjective, frustrating any attempts by Plaintiff to resolve these issues." *Id.* ¶ 23.

Defendant contends that Dr. Finkelman's declaration should be excluded because Dr. Finkelman's testimony does not satisfy the standards for admissibility set forth by Federal Rule of Evidence 702. *See* Reply at 8. Defendant also contends that Dr. Finkelman's testimony should be excluded because his finding that the PIP was subjective does not support an inference of pretext. *See id.* at 9. The Court will address each of Defendant's arguments in turn.

### (1)    Dr. Finkelman's Testimony is Admissible Under Rule 702

Federal Rule of Evidence 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The threshold for qualification is low; a minimal foundation of knowledge, skill, and experience suffices. *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1015–16 (9th Cir. 2004). In addition to determining whether an expert is qualified, when faced with a proffer of expert testimony, a district court must determine whether the testimony is both reliable and relevant. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993) (*"Daubert I"* ). The court has broad discretion in

27

1   assessing both requirements.  *See United States v. Alatorre,* 222 F.3d 1098, 1100 (9th Cir.2000).

2   Furthermore, to be admissible the expert opinion must be "help[ful] [to] the trier of fact [in]

3   understanding the evidence or… determin[ing] a fact in issue."  Fed. R. Evid. 702.

4          Here, Dr. Finkelman has established that he is qualified to provide an expert opinion.  Dr.

5   Finkelman states that he: (1) is an "industrial and forensic psychologist," (Finkelman Decl. ¶ 2); (2)

6   holds a Ph. D. in "Industrial/Organizational Psychology from New York University and an M.B.A.

7   from the Baruch School of Business of the City College of the City University of New York."  *Id.* ¶

8   3.  Additionally, while not stated in his declaration, it appears that Dr. Finkelman has taught

9   "advanced elective doctoral level course[s]... focusing on the human resource management issues

10  in employment and discrimination litigation, as well as [a] doctoral level course in Human

11  Resource Management."  *Humphreys v. Regents of Univ. of Cal.*, C 04-03808 SI, 2006 WL

12  1867713, at *3 (N.D. Cal. July 6, 2006) (citing Velez Decl., Exh. A at 1).  Dr. Finkelman also

13  "worked for 13 years in the staffing and employment industry, and was founding partner of a

14  consulting firm for staffing issues."  *Id.*  Moreover, Dr. Finkelman has testified as a human

15  resources expert in 48 state and federal matters.  *Id.* ¶ 5.  Indeed, at least one other court in this

16  district has admitted Dr. Finkelman's testimony.  *See Humphreys*, 2006 WL 1867713 at *3

17  (holding that Dr. Finkelman was qualified to offer expert testimony on generally accepted human

18  resources practices).  In light of the aforementioned facts, the Court finds that Dr. Finkelman is

19  qualified to offer an expert opinion regarding human resources practices.

20         The Court also concludes that Dr. Finkelman's testimony is sufficiently reliable.  As stated

21  by the *Humphrey's* Court, "[w]hen expert testimony is offered for 'specialized knowledge,' courts

22  have long recognized that reliability may come from experience in the field."  *Humphreys*, 2006

23  WL 1867713 at *2 (citing *Hangarter,* 373 F.3d at 1015-16; *Thomas,* 42 F.3d at 1269-70).  Here, as

24  set forth above, Dr. Finkelman has significant experience in human resources.

25         Furthermore, the Court finds that Dr. Finkelman's testimony is relevant.  Defendant

26  contends that Dr. Finkelman's testimony is not relevant to the issue of pretext because it cannot be

27  "reasonabl[y] [inferred] that because [Defendant] allegedly failed to follow human resource

28  practices when placing Plaintiff on a PIP that the real reason was retaliation for protected activity

28

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

1    that occurred approximately seven months prior (protected activity of which the decision maker

2    had no knowledge)."  Reply at 9.  As an initial matter, the Ninth Circuit has acknowledged that an

3    employer's deviation from established policy or practice may be evidence of pretext.  *See Diaz v.*

4    *Eagle Produce, Ltd.,* 521 F.3d 1201, 1214 (9th Cir.2008) (holding that the alleged discriminator's

5    termination of plaintiffs' employment without considering their length of employment, in violation

6    of the company handbook, "undermine[d] the credibility of the proffered explanations for the

7    layoffs").  Furthermore, as set forth above in connection with Plaintiff's *prima facie* case, Plaintiff

8    has adduced evidence (albeit certainly not overwhelming evidence) showing that: (1) Plaintiff's

9    supervisors were aware of Plaintiff's protected activity; and (2) there was a series of Adverse

10   Employment Events in the time between Plaintiff's protected activity and Plaintiff's being placed

11   on the PIP.  In light of the fact that the first of the Adverse Employment Events occurred shortly

12   after Plaintiff's protected activity, the Court finds that Defendant's conduct in connection with the

13   PIPs may be evidence of pretext notwithstanding the "seven month[]" gap between the PIPs and

14   the protected activity.  Reply at 9.  Dr. Finkelman's testimony regarding Defendant's conduct in

15   connection with the PIPs is therefore relevant to pretext.

16          Finally, the Court finds that Dr. Finkelman's testimony will be helpful to the Court and the

17   jury.  Defendant argues that Dr. Finkelman's testimony will not be helpful to the jury because the

18   "subject of putting an employee on a PIP is not so complicated as to require an expert opinion."

19   Reply at 8.  This argument fails.  Dr. Finkelman's testimony discusses whether Ms. Stuart-Smith

20   and Ms. Xu's actions in connection with the PIP and Final Plan were consistent with generally

21   accepted human resources practices.  Whether a supervisor's conduct in connection with placing an

22   employee on a PIP is consistent with generally accepted human resources is not a matter within the

23   knowledge of the ordinary juror or this Court.  Accordingly,  Dr. Finkelman's expert testimony

24   "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid.

25   702(a).  The Court therefore joins the *Humphrey's* Court in finding that Dr. Finkelman's testimony

26   is admissible under Rule 702.  *See Humphreys*, 2006 WL 1867713 at *2-3.[15]

---

27

28   [15] The Court notes that, in arguing that Dr. Finkelman's testimony is inadmissible, Defendant relies
     heavily on *Miller v. United States Parcel Service, Inc*.  *See* Reply at 8 (citing *Miller*, C 03-2405

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

**(2)     Subjective Criteria and a Finding of Pretext**

Defendant also argues that Dr. Finkelman's testimony should be excluded because "[t]he fact that an adverse employment decision was based on purely subjective criteria does *not* prove pretext."  Reply at 9.  Defendant cites two cases from the 11th Circuit, *Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001), and *Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000), in support of this argument.  *Id.*  Plaintiff's reliance on *Denney* and *Chapman* is misplaced.  These cases hold that an employer's stated reason for an employment decision is not necessarily pretextual *just* because the employer's reason is based on subjective criteria, so long as the subjective reason is supported by "a clear and reasonably specific factual basis."  *Denney*, 247 F.3d at 1186 ("A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." (quoting *Chapman*, 229 F.3d at 1033-34)).

*Denney* and *Chapman* are inapposite here because, unlike in those cases, Plaintiff is not simply arguing that Defendant's reasons for terminating Plaintiff's employment, as set forth in the PIPs, were pretextual because they were based on subjective criteria.  Rather, citing Dr. Finkelman's declaration, Plaintiff argues that in addition to being "subjective," the criticisms of Plaintiff's performance contained in the PIPs were "vague" (Finkelman Decl. ¶ 23), and the "performance standards" in the PIPs were not "reasonable and attainable" (*Id.* ¶ 20).  Furthermore, Defendant's conduct in connection with the PIPs, including *inter alia* failing to require that the PIPs be reviewed by Defendant's human resources department, did not follow generally accepted human resources practices.  *Id.* ¶ 22.  Thus, unlike the plaintiffs in *Denney* and *Chapman*, Plaintiff

PJH, 2004 WL 1771571, at *16 (N.D. Cal. Aug. 6, 2004) *aff'd*, 196 F. App'x 489 (9th Cir. 2006)).  *Miller* is distinguishable.  The *Miller* Court excluded the testimony of Rhoma Young, a "Human Resources expert," because: (1) Ms. Young failed to "point to any source for" recognized management practices, and (2) the subject about which Ms. Young testified, "human resources investigations," was "not so complicated as to require expert opinion."  As to the first point, an expert may testify based on his experience and knowledge of an industry.  *See Hangarter*, 373 F.3d at 1017 n.14 ("Caliri testified as to whether Defendants' practices were consistent with insurance industry standards.  This sort of analysis is dependent upon the witness's knowledge of, and experience within, the insurance industry.").  Here, the Court has found that Dr. Finkelman has a significant background in human resources.  Furthermore, as set forth above, the Court believes the subject of implementing PIPs is sufficiently unfamiliar to the Court and the jury that Dr. Finkelman's testimony may be helpful.  Accordingly, Plaintiff's reliance on *Miller* is misplaced.

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

1   has adduced facts showing more than that the PIPs incorporated subjective criteria.

2         For the reasons set forth above, the Court concludes that Dr. Finkelman's testimony

3   regarding Defendant's compliance with generally accepted human resources standards is

4   admissible for the purposes of resolving the instant Motion for Summary Judgment.[16]  The Court

5   further finds that Dr. Finkelman's testimony supports the conclusion that Defendant's proffered

6   reason for terminating Plaintiff was mere pretext.  *See Diaz,* 521 F.3d at 1214 (holding that the

7   alleged discriminator's termination of plaintiffs' employment without considering their length of

8   employment, in violation of the company handbook, "undermine[d] the credibility of the proffered

9   explanations for the layoffs"); *Humphreys,* 2006 WL 1867713 at *2 (holding that "[t]he

10  University's failure to follow such practices [was] relevant to plaintiff's contention that the layoff

11  was a pretext for gender discrimination or retaliation.").

12        **d)**    **Proximity of Adverse Employment Events to Plaintiff's**
                        **Protected Activity**

13        Plaintiff also argues that the proximity of the Adverse Employment Events to Plaintiff's

14  protected activity provides circumstantial evidence showing that Defendant's actions were taken

15  for retaliatory reasons.  *See* Opposition at 21-22.  Specifically, Plaintiff argues that the fact that

16  Plaintiff was transferred to the "dysfunctional CDK team and assigned an inordinately high

17  workload" "*immediately* after [Plaintiff refused] to participate in the illegal and unethical PanHER

18  program" provides circumstantial evidence that Defendant's explanations for the Adverse

19  Employment Events are mere pretext.  *Id.* at 22.

20        While the timing of an adverse employment event alone will not suffice to show pretext,

21  timing may, in conjunction with other evidence, be probative of pretext.  *See Stegall v. Citadel*

22  *Broadcasting Co.*, 350 F.3d 1061, 1069 (9th Cir. 2003) (holding that district court should have

23  "consider[ed] the time of [Plaintiff's] termination in its pretext analysis).  Here, as set forth above,

24  Plaintiff has adduced evidence showing that shortly after Plaintiff requested that she be transferred,

25  Plaintiff was transferred to the arguably dysfunctional CDK team and assigned an abnormally high

26  workload and that other Adverse Employment Events followed.  These facts, in combination with

27

28  _____

[16] The Court notes that the Court admits only the portions of Dr. Finkelman's declaration relied upon in this Order.  The Court disregards the remaining portions of the declaration.

31

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

the evidence from Dr. Finkelman discussed above, create a triable issue of fact as to whether

Defendants' stated justification for terminating Plaintiff was pretextual.[17]

Given the Court's conclusions that Plaintiff has adduced sufficient evidence to state a prima

facie claim for retaliation and to create a triable issue of fact as to whether Defendant's proffered

justification for terminating Plaintiff is mere pretext, the Court finds that Plaintiff has provided

evidence sufficient to support a claim under Section 1102.5. Thus, Plaintiff's wrongful termination

claim based on a violation of Section 1102.5 survives summary judgment. *Earl*, 658 F.3d at 1118.

The Court therefore DENIES Defendant's Motion for Summary Judgment as to Plaintiff's sole

cause of action. In denying Defendant's Motion, the Court notes that the Court has only found that

there is a triable issue of fact with respect to Plaintiff's sole cause of action. In finding a triable

issue of fact, the Court expresses no opinion on the relative merits of the parties' positions.

## B.    Attorney's Fees

Defendant also argues that the Court should grant summary judgment in favor of Defendant

with respect to Plaintiff's request for attorney's fees under California Code of Civil Procedure

Section 1021.5. *See* Motion at 19-21.

Section 1021.5 provides that "[u]pon motion, a court may award attorneys' fees to a

successful party against one or more opposing parties in any action which has resulted in the

enforcement of an important right affecting the public interest…." In order to award attorney fees

under Section 1021.5, three requirements must be met: (1) the action must enforce an important

right affecting the public interest; (2) "a significant benefit… [must] ha[ve] been conferred on the

general public or a large class of persons…." ; and (3) the necessity and cost to the plaintiff in

bringing a private enforcement action must outweigh the plaintiff's stake in the action. Cal. Civ.

---

[17] In the section of Defendant's Reply addressing Dr. Finkelman's testimony, Defendant also argues that the seven month gap between the issuance of the PIP and Plaintiff's request that she be transferred precludes a finding that the former action was taken in retaliation for the latter, this argument fails. *See* Reply at 9. As set forth above, Plaintiff has adduced evidence showing that the issuance of the PIPs were part of a series of retaliatory acts beginning shortly after Plaintiff requested that she be transferred and culminating in Plaintiff's termination. Thus the temporal proximity of the chain of Adverse Employment Events has been sufficiently established. Finally, to the extent Defendant contends that none of the decision makers responsible for the Adverse Employment Events were aware that Plaintiff had engaged in protected activity (*see* Reply at 9), this argument was also rejected above.

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    Proc. Code § 1021.5; *see also Acme Fill Corp. v. Althin CD Med., Inc. ("Acme")*, C 91-4268

2    MMC, 1995 WL 822662, at *2 (N.D. Cal. Oct. 12, 1995) (setting forth requirements).

3          Defendant argues that Plaintiff is unable to satisfy any of the three requirements for

4    attorney's fees under Section 1021.5.  *See* Motion at 20.  This Court agrees with Defendant that it

5    is unlikely that Plaintiff will be able to show that Plaintiff is entitled to attorney's fees under

6    Section 1021.5.  In particular, the Court has concerns about Plaintiff's ability to show that

7    Plaintiff's lawsuit, even if successful, will confer a benefit on the public or a large class of persons.

8    Plaintiff's lawsuit, which relates to whether *Plaintiff* (and not anyone else) was terminated for

9    retaliatory reasons, appears designed to "vindicate only [Plaintiff's] rights" and not the rights of

10   anyone else.  *Pac. Legal Found. v. Cal. Coastal Com.*, 33 Cal. 3d 158, 167 (1982).  Moreover,

11   given the highly fact specific nature of a retaliation case, it is unlikely that a resolution in Plaintiff's

12   favor will provide a precedent that will be determinative in future cases or that will "certainly lead"

13   Defendant to change its practices with respect to employees who refuse to engage in potentially

14   illegal conduct.  *Id.*  Under these circumstances, an award of attorney's fees under Section 1021.5

15   is generally not permitted.  *See id.* (denying attorney's fees where because "[t]he decision

16   vindicated only the rights of the owners of a single parcel of property"); *Flannery v. California*

17   *Highway Patrol*, 61 Cal. App. 4th 629, 635 (1998) ("When the record indicates that the primary

18   effect of a lawsuit was to advance or vindicate a plaintiff's personal economic interests, an award of

19   fees under section 1021.5 is improper.").

20         Nevertheless, whether attorney's fees are appropriate under Section 1021.5 is an issue that

21   is ordinarily decided after judgment has been entered.  *Cf Marini v. Mun. Court*, 99 Cal. App. 3d

22   829, 834 (1979) ("[S]ection 1021.5… provides a special motion procedure… intended to be

23   initiated after the result of the action is known….").  Indeed, the benefit conferred by a case often

24   cannot be fully determined until after the result is known.  For example, in *Press v. Lucky Stores,*

25   *Inc.*, the Court held that plaintiffs' lawsuit, which resulted in a preliminary injunction prohibiting

26   defendant Lucky Stores from barring plaintiffs from soliciting signatures in front of Lucky's Santa

27   Monica store, had conferred a public benefit in part because the result in *Press* convinced Lucky's

28   attorney to advise Lucky to permit plaintiffs' access to Lucky's other stores.  *Press*, 34 Cal. 3d 311,

33

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

320-21 (1983).  This result could not necessarily have been anticipated before the judgment was rendered.  Thus, while the Court is dubious as to whether a judgment in Plaintiff's favor in this case will be useful to anyone besides Plaintiff, the Court believes it prudent to reserve the issue of attorney's fees for a post-judgment motion.

For the reasons set forth above, Defendant's Motion with respect to the issue of whether attorney's fees are appropriate under Section 1021.5 is DENIED without prejudice.

**C.      Punitive Damages**

Defendant argues that summary judgment should be granted in Defendant's favor on the issue of whether Plaintiff is entitled to punitive damages.  *See* Motion at 19.

Under California law, punitive damages may be appropriate "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294.  "In the usual case, the question of whether the defendant's conduct will support an award of punitive damages is for the trier of fact…."  *Johnson & Johnson v. Superior Ct.,* 192 Cal. App. 4th 757, 762 (2011) (internal citations omitted).  "Summary judgment on the issue of punitive damages is proper only when no reasonable jury could find the plaintiff's evidence to be clear and convincing proof of malice, fraud or oppression."  *Id.*  In adjudicating the issue of punitive damages at the summary judgment stage, courts should not impose on a plaintiff the obligation to "prove" its case.  *Id.*

Here, Defendant argues that Plaintiff is not eligible for punitive damages because Plaintiff has produced "no evidence of any wrongful conduct, let alone 'clear and convincing' proof of any oppression, fraud or malice on the part of anyone at Pfizer."  Motion at 19.  Defendant additionally argues that punitive damages are not appropriate because Ms. Stuart-Smith did not "harbor[] any ill will towards Plaintiff" and was "not an officer, director, or managing agent of Pfizer."  *Id.*  Furthermore, Defendant argues, Ms. Xu "did not authorize or ratify any wrongful conduct" and was not aware that "Plaintiff refused to engage in allegedly illegal conduct."  *Id.*

While Defendant's arguments may ultimately prove meritorious, the Court has concluded above that Plaintiff has presented sufficient evidence, for summary judgment purposes: (1) to show that both Ms. Stuart-Smith and Ms. Xu had knowledge that Plaintiff had refused to participate in

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

illegal conduct, and (2) to support an inference that these individuals may have acted for a

retaliatory purpose.  Accordingly, the issue of whether there was malice, fraud, or oppression

should be decided by the jury.  The jury should also determine whether Ms. Stuart-Smith was an

officer, director, or managing agent.  *See White v. Ultramar, Inc.,* 21 Cal. 4th 563, 567 (1999)

("The scope of a corporate employee's discretion and authority under our test is… a question of

fact….").  Accordingly, Defendant's Motion with respect to whether punitive damages are

appropriate in this case is DENIED without prejudice.

**V.      CONCLUSION**

            For the reasons set forth above, Defendant's Motion is DENIED.

**IT IS SO ORDERED.**

Dated: January 10, 2013

                                                                 _Lucy H. Koh_
                                                          _____
                                                          LUCY H. KOH
                                                          United States District Judge

Case No.: 11-CV-04486
ORDER DENYING MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California